IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                Plaintiff,

vs.                                                              No. 18-CR-2216- JAP

OMIL COTTO,

                Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

On August 14, 2018, a federal grand jury returned an indictment charging Defendant Omil Cotto with one count of unlawfully, knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); one count of knowingly using, carrying and discharging a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 34). On September 6, 2018, Defendant filed a Motion to Suppress Evidence Derived as a Result of an Invalid Search Warrant for 1314 Apodaca St. S.W., Albuquerque, New Mexico (Doc. 39) (Motion), asking the Court to suppress all physical evidence that officers seized pursuant to a search of the residence located at 1314 Apodaca Street S.W. executed on May 31, 2018. The United States opposes the Motion, and it is fully briefed.[1]

---

[1] *See* UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 42) (Response); DEFENDANT OMIL COTTO'S SUPPLEMENTAL MEMORANDUM TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 47) (Reply); UNITED STATES' SUR-REPLY TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 51) (Sur-reply).

The Court heard evidence and argument from counsel at a hearing on November 28, 2019. Assistant United States Attorney Peter Eicker appeared on behalf of Plaintiff, United States of America. Defendant was present in the courtroom and represented by Attorney Erlinda Ocampo Johnson. At the close of the hearing, the Court granted leave for the parties to submit additional briefing specifically on applicability of the inevitable discovery doctrine to this case.[2] Having considered the parties' briefs, arguments, evidence, and relevant case law, the Court will deny Defendant's Motion.

## I.  BACKGROUND

At approximately 2:39 p.m. on May 31, 2018, the Bernalillo County Sheriff's Office received multiple calls reporting a possible road rage incident that occurred near the intersection of Edith and Montano in Albuquerque involving shots being fired from a vehicle. Law enforcement officials, including Bernalillo County Sheriff's Office Detectives Ryan Zamora and Nick Marrujo with the Violent Crimes Unit, responded to the calls. Detective Marrujo and another officer reviewed surveillance camera footage from a nearby business that had captured the incident. The footage showed a black SUV strike a yellow Camaro from behind. The male driver of the yellow Camaro then got out and fired multiple shots at the SUV as it fled. A few moments later, a red Camaro with a female driver arrived on the scene. The male driver of the yellow Camaro removed items from the yellow Camaro, placed them in the red Camaro, and left the area in the red Camaro. The female who had driven up in the red Camaro then entered the driver's seat of the yellow

[2] *See* DEFENDANT OMIL COTTO'S SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 53) (D. Supp. Memo.); UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S SECOND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS (Doc. 56) (U.S. Supp. Response); UNITED STATES' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 54) (U.S. Supp. Memo); DEFENDANT OMIL COTTO'S RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 57) (D. Supp. Response).

Camaro and waited for officers to arrive. The female on scene in the yellow Camaro was identified as Karen Perez-Morales. She advised officers that her husband, Omil Cotto-Gomez, was the driver of the other Camaro and that he had left the area. The address associated with Karen Perez's driver's license was 1314 Apodaca Street S.W. in Albuquerque, New Mexico.

After viewing the surveillance footage, Detective Marrujo was tasked with drafting an affidavit for a search warrant of the residence located at 1314 Apodaca Street S.W. (Apodaca Street residence) in Albuquerque, New Mexico. He returned to the station to begin drafting the affidavit while simultaneously monitoring radio communications between the detectives who had gone to the 1314 Apodaca Street location. While listening to these communications, Detective Marrujo heard officers describe that Defendant was on the property and that he and other people were in and out of the Apodaca Street residence on at least one occasion. One of the detectives on scene later included in his report that he saw Defendant entering and exiting the house at least one time. Sometime later, Detective Marrujo learned through the radio communications that officers had taken Defendant into custody at the Apodaca Street location.

Like Detective Marrujo, Detective Ryan Zamora had also been dispatched to the scene of the alleged road rage incident a little after 3:00 p.m. Upon arrival, he noted a disabled yellow Camaro that had damage consistent with a crash. Detective Zamora also observed bullet casings on the ground where the yellow Camaro had come to a rest. After viewing the scene at Edith and Montano, Detective Zamora accompanied another detective to the location where the black SUV, the other vehicle involved in the incident, was stopped. The black SUV contained a female driver and her minor child who was in the back seat. The other detective interviewed the female driver. Detective Zamora was then dispatched to the Apodaca Street residence for the purpose of interviewing two people there, Rubi Perez and Jorge Lopez Sandoval.

Detective Zamora arrived at the Apodaca Street residence a little after 6:00 p.m. He interviewed Jorge Lopez Sandoval first at approximately 6:16 p.m. (*See* Def. Ex. G, Transcript of Interview with Jorge Lopez Sandoval). Mr. Lopez Sandoval was taken into custody at the same time as Defendant, was in handcuffs, and was not free to leave. Detective Zamora directed him to a police truck on scene and the two entered the vehicle for the interview. Before questioning, Detective Zamora advised Mr. Lopez Sandoval of his *Miranda*[3] rights. With those rights in mind, Mr. Lopez Sandoval agreed to speak with Detective Zamora. Mr. Lopez Sandoval explained that he lived at the Apodaca Street residence with his wife Rubi Perez and the couple's children. Rubi Perez is Karen Perez-Morales' sister. Karen Perez-Morales is Defendant's wife.

Mr. Lopez Sandoval recounted that when he got home from work, Defendant was at the Apodaca Street residence dropping his daughter off to stay with Mr. Lopez Sandoval's wife Rubi Perez. Although Defendant's red Camaro was parked at the Apodaca Street residence, Defendant had asked Mr. Lopez Sandoval for a ride to Defendant's house to pick up a car and possibly some diapers for Defendant's daughter. As the interview progressed, Mr. Lopez Sandoval revealed that when the two men first got to Defendant's house, Defendant asked if he could retrieve a rifle. Mr. Lopez Sandoval agreed. Defendant emerged from his house with a large bag which he placed in the trunk of Mr. Lopez Sandoval's white Nissan. However, Defendant did not get his car because he had forgotten the keys. The men then stopped at a store to buy some dinner groceries and returned to the Apodaca Street residence. According to Mr. Lopez Sandoval, once at the Apodaca Street residence, Defendant removed from the trunk of the white Nissan the bag he had told Mr. Lopez Sandoval contained a rifle. Defendant then placed the bag in a corner room that had a television inside the Apodaca Street residence. Mr. Lopez Sandoval stated that he never actually

---

[3] *See Miranda v. Arizona,* 384 U.S. 436 (1966).

saw the rifle, just the large bag Defendant had told him held a rifle. The two men returned from the Apodaca Street house to the white Nissan so Mr. Lopez Sandoval could take Defendant back to his house again now that Defendant had the car keys. As soon as Mr. Lopez Sandoval put the Nissan in reverse, the police arrived with guns drawn, took Defendant and Mr. Lopez Sandoval into custody, and placed the men in handcuffs. Mr. Lopez Sandoval recalls that he was in handcuffs for several hours. He was released after speaking to Detective Zamora.

Detective Zamora next interviewed Mr. Lopez Sandoval's wife, Rubi Perez, around 6:39 p.m. (*See* Def. Ex. H, Transcript of Interview with Rubi Perez). Ms. Perez was standing outside of the Apodaca Street residence while Detective Zamora interviewed her. Ms. Perez recalled that sometime around 4:30 or 5:00 p.m., officers arrived at the house with guns drawn and removed all occupants from inside of the house to conduct a protective sweep. Ms. Perez was not handcuffed but she was also not allowed to leave. Nevertheless, Ms. Perez testified that the officers who spoke with her were respectful. As with Mr. Lopez Sandoval, Detective Zamora advised Ms. Perez of her *Miranda* rights before conducting the interview. Ms. Perez acknowledged that she understood these rights and agreed to speak with Detective Zamora.

Ms. Perez told Detective Zamora that Defendant showed up at the Apodaca Street residence asking to leave his daughter with her and declaring that Ms. Perez's sister, Karen Perez-Morales, had been in an accident. Ms. Perez observed that Defendant had a red and black Jordan backpack while he was in the living room, but she did not notice whether Defendant took the bag with him or left it somewhere inside the house. She heard Defendant go into her room but did not know the reason. Following the approximately nine-minute-long interview, Ms. Perez was released. However, officers did not allow Ms. Perez or the other Apodaca Street occupants to reenter the house until after the search was completed.

Based on the investigation, Detective Marrujo completed the search warrant affidavit. (*See* Gov't Ex. 1, Search Warrant & Affidavit). The search warrant affidavit described the property to be searched and contained a request to seize: (1) "any and all firearm evidence to include pistols, revolvers, rifles, shotguns, etc., as well as any spent casings, live ammunition, holsters, etc." and (2) any cell phones located in the home. After recounting his training and experience as a law enforcement officer, Detective Marrujo set forth several facts and circumstances meant to establish probable cause for the search of the Apodaca Street residence, as well as sheds, storage bins, bags, or vehicles associated with the property, for evidence of crimes relating to the alleged road race incident, including the crime of shooting at or from a motor vehicle.

The affidavit stated that deputies were dispatched to a possible road rage incident where shots were fired. Officers arrived to find Karen Perez-Morales sitting inside of a disabled yellow Camaro with rear end damage. She explained that she was driving the yellow Camaro when a black SUV struck her from behind and fled. She also informed officers that her husband, Omil Cotto, was driving a red Camaro that had also left the area. Detective Marrujo next described what he and the other detective had viewed on the surveillance footage. The affidavit concludes with four sentences specific to Defendant:

> Deputies on scene researched Omil Cotto-Gomez and found him to be a convicted of at least one felony crime within the past 10 years.

> Omil was later apprehended at 1314 Apodaca St. SW. after he arrived as a passenger in a white Nissan car bearing NM plate [redacted].

> Prior to being taken into custody, Omil was seen reaching toward the floor board of the Nissan, in a possible attempt to reach for something or to hide something.

> It should be noted that the red Chevy Camero [sic] that Omil fled the scene in was also located at 1314 Apodaca St. SW.

Detective Marrujo submitted the warrant affidavit to his supervisor and obtained approval. At approximately 6:32 p.m. on May 31, 2018, an assistant district attorney also approved the search warrant and affidavit, and at approximately 7:42 p.m. Second Judicial District Court Judge William Parnall telephonically approved issuance of the search warrant. While executing the warrant, detectives located a red and black Jordan backpack in a bedroom. Detectives found two large bundles wrapped in black electrical tape inside the backpack. Based on his training and experience, Detective Marrujo believed the bundles contained illegal narcotics. Because the original warrant application did not address seizure of illegal drugs, Detective Marrujo applied for an amended warrant for authority to seize the bundles and related paraphernalia. The amended warrant application contained the same information that was in the original application, but it had additional information pertaining to the bundles that officers had found. Around 9:30 p.m., the same assistant district attorney who had approved the earlier warrant approved the amended warrant affidavit, and at 9:40 p.m. Judge Parnall approved issuance of the amended warrant permitting officers to search for and seize any illegal drugs, packaging, scales or cash. (*See* Gov't Ex. 2, Amended Search Warrant & Affidavit).

Detectives seized the two bundles which later field-tested positive for methamphetamine. (Doc. 42 at 7). Detectives also located a .40 caliber Glock pistol, the license plate for the red Camaro, and identification bearing Defendant's name and photo. (Doc. 42 at 7). Additionally, Detectives found a rifle and ammunition inside the Apodaca Street residence. (Doc. 42 at 7). After waiving his *Miranda* rights and agreeing to speak with detectives, Defendant made incriminating statements. Defendant now seeks to suppress all physical evidence derived from the search of 1314 Apodaca Street S.W. claiming the search violated his Fourth Amendment rights. (Doc. 39).

## II.     LEGAL STANDARD

"Suppression of evidence is an appropriate remedy only when the search violates a person's constitutional rights." *United States v. Gama-Bastidas*, 142 F.3d 1233, 1238 (10th Cir. 1998). "The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *Id.* (internal quotation marks and citation omitted). However, it is the government's burden to show the admissibility of the evidence it seeks to introduce. *See United States v. Mikolon*, 719 F.3d 1184, 1189 (10th Cir. 2013).

## III.     ANALYSIS

Defendant's Motion[4] raises several issues. The primary issues are: (1) whether Defendant has standing to challenge the search of the Apodaca Street residence; (2) whether the search warrant was supported by probable cause that established a nexus between the Apodaca residence and the alleged illegal activity; (3) whether the warrant was overbroad; (4) whether, if the warrant lacked probable cause, the good faith exception applies; and finally (5) whether the inevitable discovery doctrine applies.

### A. Defendant Has Standing to Challenge the Search of 1314 Apodaca Street S.W.

As an initial matter, Defendant contends that although he did not own or permanently reside at 1314 Apodaca Street S.W., he was a social guest based on his "degree of acceptance into the household" and had "an ongoing and meaningful connection to the home" (Doc. 39 at 5) (quoting *United States v. Rhiger,* 315 F.3d 1283, 1286-87 (10th Cir. 2003)). The United States rejects Defendant's position, arguing that, based on the totality of the circumstances, Defendant did not have an expectation of privacy in the Apodaca residence and thus lacks standing to challenge the

---

[4] The Court includes here the additional argument Defendant raised in his Reply with leave of the Court.

search. (Doc. 42 at 12). The burden is on Defendant to establish standing. *United States v. Creighton,* 639 F.3d 1281, 1286 (10th Cir. 2011).

A defendant can challenge a search under the Fourth Amendment if "the defendant manifested a subjective expectation of privacy in the area searched and [if] society is prepared to recognize that expectation as objectively reasonable." *United States v. Eckhart,* 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks and citation omitted). The U.S. Supreme Court held that an overnight guest has a reasonable expectation of privacy in the home of his host. *See Minnesota v. Olson,* 495 U.S. 91, 98-99 (1990). The Tenth Circuit extended this principle further by holding that "a social guest who does not stay overnight has a reasonable expectation of privacy" in the host's property. *United States v. Poe,* 556 F.3d 1113, 1122 (10th Cir. 2009). However, "[i]n order for a social guest to qualify for protection under the Fourth Amendment, there must be a degree of acceptance into the household, or an ongoing and meaningful connection to [the host's] home establishing the person's status as a social guest." *Untied States v. Maestas,* 639 F.3d 1032, 1036 (10th Cir. 2011) (alterations in original) (internal quotation marks and citations omitted).

For example, in *United States v. Thomas,* the Tenth Circuit held that a defendant had standing to raise a Fourth Amendment challenge to the search of his aunt and uncle's home based on the defendant's testimony that he had been invited to his aunt and uncle's house to celebrate New Year's Eve, had planned to spend the night there, and that his plans to stay were "okay" with his aunt and uncle. 372 F.3d 1173, 1176 (10th Cir. 2004). Similarly, in *United States v. Rhiger* the Tenth Circuit held that a defendant who had stayed the night on prior occasions and was a regular social guest in the home, had standing to challenge the search of the home, even though there was no showing that he was staying overnight on the occasion of the search. 315 F.3d at 1286-87.

Jose Perez, Defendant's father-in-law, testified that he lives at 1314 Apodaca Street S.W. and shares ownership of the property with his daughter Rubi Perez. (*See also* Def. Ex. B, Purchaser's Closing Statement). He described that Defendant, Mr. Perez's daughter Karen, and Mr. Perez's granddaughter lived at the Apodaca Street residence from approximately November 2017 to February 2018. Even after Defendant and his wife, Karen Perez-Morales, moved to a rental property, Defendant had access to a key and permission to go to the house and enter without knocking. Rubi Perez lives at the Apodaca Street residence with her father Jose and her family. Ms. Perez testified that Defendant, her sister Karen Perez-Morales, and her niece, came to visit the house every week or two, often bringing groceries for everyone to share a meal. Occasionally the three would spend the night at the Apodaca Street residence. Defendant continued to receive official mail at the house even after he moved out, and Mr. Perez confirmed that Defendant was still allowed to check the mail. (*See also,* Def. Exs. D & E, Official Mail Addressed to Omil Cotto at 1314 Apodaca St. S.W.). Defendant and his wife also kept two suitcases of clothing in a bedroom at the house. As in *Rhiger*, here Defendant's regular presence at the Apodaca Street residence, occasional overnight stays, receipt of official mail, and ability to enter and exit the home as he pleased, all support the conclusion that he had an ongoing meaningful connection to the house as a social guest. The Court concludes that Defendant has standing to challenge the detectives' search and seizure of evidence from the Apodaca Street residence.

**B. The Warrant Authorizing the Search of the Apodaca Street Residence Was Supported by Probable Cause**

Given Defendant's legitimate expectation of privacy in the Apodaca Street residence, the Court addresses whether the search warrant affidavit established probable cause to search the home. Defendant maintains that Detective Marrujo's warrant affidavit failed to present facts

sufficient to establish a nexus between the suspected criminal activity and the Apodaca house, thereby eviscerating probable cause. (Doc. 39 at 7).

"A search warrant must be supported by probable cause requiring 'more than mere suspicion but less evidence than is necessary to convict.'" *United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000) (quoting *United States v. Burns,* 624 F.2d 95, 99 (10th Cir. 1980)). "Probable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity in the place to be searched." *United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998) (alteration in original) (internal quotation marks and citation omitted). "Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime." *Rowland,* 145 F.3d 1194, 1204 (10th Cir. 1998). Rather, it requires "additional evidence" linking the residence to the suspected criminal activity. *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009). Whether a sufficient nexus exists is a fact specific inquiry. *Biglow*, 562 F.3d at 1279. The Tenth Circuit established a set of non-exclusive factors for courts to consider in a nexus analysis: "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence." *Id.*

The Court recognizes that the warrant issuing judge's probable cause determination should be accorded "great deference," and that a judge is vested with substantial discretion to draw all "reasonable inferences" from the Government's evidence. *Illinois v. Gates,* 462 U.S. 213, 236, 240 (1983) (internal quotation marks omitted). The probable cause determination will be upheld so long as the issuing judge had a substantial basis for concluding that the search warrant would uncover evidence of criminal activity. *Id.* Because of the Fourth Amendment's strong preference for warrants, courts will resolve any "doubtful or marginal cases" by deferring to the issuing

judge's probable cause determination. *Biglow*, 562 F.3d at 1282. This case presents a close question, but the Court ultimately concludes that the warrant had sufficient evidence of a nexus to support Judge Parnall's probable cause determination.

Sufficient evidence in the warrant affidavit certainly supports the conclusion that Defendant committed the crimes of shooting at or from a motor vehicle and being a felon in possession of a firearm. The affidavit details that at the scene of the incident officers learned from Karen Perez-Morales that her husband Omil Cotto-Gomez had left the area in a red Camaro. Detectives viewed surveillance footage of the incident which showed a male exiting a yellow Camaro, firing shots at another vehicle, removing something from the yellow Camaro, placing it into the red Camaro, and leaving the scene of the shooting in the red Camaro. Finally, the affidavit states that deputies researched Defendant and learned that he was convicted of at least one felony crime within the past ten years.

Nevertheless, the affidavit must also set forth the requisite "additional evidence" necessary to establish a nexus between evidence of Defendant's suspected criminal activity and the Apodaca Street residence. Courts do not require "hard evidence or personal knowledge of illegal activity [to] link a Defendant's suspected activity to his home." *Biglow,* 562 F.3d at 1279. For example, in the context of suspected illegal drug activity, it is sufficient for the affiant to indicate based on his training and experience that drug dealers often keep evidence related to their illegal activities in their homes. *Biglow,* 562 F.3d at 1283 (internal quotation marks and citation omitted). Defendant here contends that the affidavit provides no evidence at all connecting him to the Apodaca Street residence, let alone evidence that 1314 Apodaca St. S.W. was his home.

Defendant cites to *United States v. Dutton*, 509 F. App'x 815 (10th Cir. 2013) to support his position that the search warrant affidavit lacked the additional evidence necessary to establish

a nexus. In *Dutton* the defendant argued that a warrant authorizing the search of a storage unit for possible explosive devices lacked probable cause. 509 F. App'x at 815. The affidavit described a series of encounters between the defendant and another individual at the defendant's apartment in which the defendant produced what he claimed was a fuse for a hand grenade, discussed ordering additional items to complete explosive devices, and made other statements that led the affiant to believe that the defendant had "acquired items needed to build an Improvised explosive device for himself at his apartment *or possibly his storage unit*." *Id.* at 816 (emphasis in original). The affidavit went on to describe the location of "Outback storage building unit number 6." *Id.* A magistrate judge issued the warrant, and upon execution, law enforcement agents found unregistered destructive devices. *Id.* at 816-17.

In addressing the defendant's motion to suppress the evidence, the Tenth Circuit took no issue with the notion that Defendant could reasonably be expected to keep explosive related materials in his storage unit. *Id.* at 817. However, the court concluded that the "fatal flaw" in the search warrant was that the supporting affidavit did not connect the storage unit to be searched with the Defendant. *Id.* at 817-18. The Tenth Circuit explained that the first mention of any storage unit was at the very end of the affidavit, and that the affidavit provided no reason to believe either that Defendant had a storage unit or that the unit described in the warrant was one that he owned. *Id.* at 818. Ultimately, the Tenth Circuit concluded that "[n]othing in the affidavit for the warrant connected Defendant to the storage unit," and reversed the lower court's denial of the defendant's motion to suppress. *Id.* at 815.

The Court finds that *Dutton* is distinguishable from this case. In *Dutton,* the Tenth Circuit highlighted that there was nothing at all in the affidavit to establish a nexus. *Id.* at 815. Here, however, there is some factual basis connecting Defendant to the Apodaca Street residence.

Surveillance footage discussed in the affidavit revealed a male exiting a yellow Camaro and firing shots. A few moments later, a red Camaro driven by a woman arrives. The male removes something from the yellow Camaro, places it into the red Camaro, and leaves the scene of the incident in the red Camaro. The female driver remains at the scene in the yellow Camaro. She tells officers that her husband, Omil Cotto-Gomez (Defendant), left the area in a red Camaro. The affidavit then recounts that "the red Chevy Camero [sic] that Omil fled the scene in was also located at 1314 Apodaca St. SW." The affidavit also states that "Omil was later apprehended at 1314 Apodaca St. SW." From this evidence, it is reasonable to infer a connection between Defendant and the Apodaca Street residence. Moreover, a reviewing judge could infer from these facts that evidence of Defendant's crime could be found in the red Camaro or inside the Apodaca Street residence because defendant could reasonably be expected to conceal a gun in these locations. Accordingly, the Court finds that the warrant authorizing the search of the Apodaca Street residence for firearms or evidence of firearms was supported by probable cause.

### C. The Good Faith Exception Applies to the Warrant

Even if the search of the Apodaca Street residence was not supported by probable cause, the evidence obtained as a result of the search would still be admissible under the good-faith exception to the warrant requirement. The Tenth Circuit has held that suppression of evidence is not necessary where an officer relied in good faith on a duly authorized search warrant, even though the supporting affidavit did not establish probable cause. *United States v. Beck,* 139 F. App'x 950, 954-55 (10th Cir. 2005). The test to determine whether the good faith exception should apply "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon,* 468 U.S. 897, 923, n. 23 (1984). "For good faith to exist, there must be *some*

14

factual basis connecting the place to be searched to the defendant or suspected criminal activity." *United States v. Gonzales,* 399 F.3d 1225, 1231 (10th Cir. 2015); *see also United States v. Campbell,* 603 F.3d 1218, 1231 (10th Cir. 2010) ("An affidavit is not devoid of factual support if it establishe[s] a minimally sufficient nexus between the illegal activity and the place to be searched." (alteration in original) (internal quotation marks omitted)). "When this connection is wholly absent, the affidavit and resulting warrant are 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Gonzales,* 399 F.3d at 1231 (quoting *Leon*, 468 U.S. at 923).

Defendant argues that Detective Marrujo's reliance on the search warrant here was wholly unreasonable because the warrant affidavit lacked any indicia of probable cause, and Defendant harkens the circumstances in his case to those in *United States v. Gonzales,* 399 F.3d 1225 (10th Cir. 2005). (Doc. 39 at 18). In *Gonzales*, the Tenth Circuit upheld the district court's determination that the good faith exception to the exclusionary rule did not apply where there was no evidence to connect the place to be searched to the defendant or the suspected criminal activity. 399 F.3d at 1231. In that case, officers sought permission to search the defendant's house for firearms and ammunition. *Id.* at 1227. The warrant arose out of a one-car accident in which the defendant rolled a vehicle after he had been drinking. *Id.* Officers arrested the defendant. *Id.* Prior to towing the vehicle, officers conducted an inventory search and found a Glock 10 mm magazine with nine live rounds. *Id.* Officers also learned that the defendant was a convicted felon, and that the vehicle was registered to a man who had a relationship with the defendant's mother and lived with the defendant. *Id.*

The warrant affidavit listed "321 E. Church" place to be searched, detailed the accident and inventory search, and described the residence with particularity. *Id.* at 1227-28. But the

affidavit never specified that 321 E. Church was the defendant's residence. *Id.* In fact, "there were no facts explaining how the address was linked to [the defendant], the vehicle, or the suspected criminal activity, or why the officer thought the items to be seized would be located at the residence." *Id.* Instead, besides the physical description of the property, the only facts before the magistrate judge were that the defendant was a convicted felon and that a Glock 10 mm magazine was found in a vehicle the defendant had been driving. *Id.* "The only attempt at a connection was the detective's assertion that in his experience, 'firearm [sic] are often kept at the residence.'" *Id.* The court held that "good faith may exist when a *minimal* nexus between the place to be searched and the suspected criminal activity is established." *Id.* (emphasis added). However, the *Gonzales* affidavit failed to establish even that minimal nexus. *Id.*

In contrast to *Gonzales,* the search warrant here establishes "*some* factual basis connecting" Defendant to the Apodaca Street residence. *Id.* at 1231 (emphasis original). The male shooting suspect in the surveillance video put items into a red Camaro and left the scene of the shooting incident. Ms. Perez-Morales stated that her husband Omil Cotto-Gomez had left the area of the shooting in a red Camaro. The red Camaro that Defendant left the scene of the shooting in was parked at 1314 Apodaca Street where Defendant was apprehended. Moreover, the Court agrees with the United States that Detective Marrujo employed a reasonable process in seeking the warrant, and exercised caution in requesting an amended warrant to seize the drugs that were located during the search of the Apodaca Street residence. While this fact alone does not establish good faith reliance, *see Gonzales*, 399 F.3d at 1230, it is a factor the Court may consider in its analysis. The Court concludes that the warrant here established a minimally sufficient nexus and the officers' reliance upon it was objectively reasonable.

In making this alternative holding that the good faith exception applies to the warrant in this case, the Court recognizes that applying the exclusionary rule to the evidence seized from the 1314 Apodaca Street residence would not further the rule's "purpose of deterring improper police action." *Gonzales,* 399 F.3d at 1229. "The rule's sole purpose…is to deter future Fourth Amendment violations." *Davis v. United States,* 564 U.S. 229, 236-37 (2011). As a result, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.* at 237; *see also Herring v. United States,* 555 U.S. 135, 144 (2009). The "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring,* 555 U.S. at 145.

Officers should be deterred from inadvertently omitting information that supports probable cause from an affidavit. They should be encouraged to be thorough. But, in this case, even if the Court were to have determined that there was a Fourth Amendment violation, the Court would not have arrived at that conclusion because of deliberate, reckless, or grossly negligent conduct on the part of Detective Marrujo. Rather, Detective Marrujo not only showed caution in seeking and obtaining a warrant from a judge, but he also stopped the search in progress and sought an amended warrant out of an abundance of caution when he saw what appeared to be illegal narcotics in plain view. As the Supreme Court noted in *United States v. Leon*, 468 U.S. 897 (1984), "[o]ne could argue that applying the exclusionary rule in cases where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations…and thus promotes the ends of the Fourth Amendment." But the Supreme Court found "such arguments speculative" and concluded "that suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* The Court acknowledges that this is a close case, but it is not one of

those unusual cases in which exclusion of evidence will further the purposes of the exclusionary rule.

**D. The Evidence Seized from 1314 Apodaca Street is Admissible Under the Inevitable Discovery Doctrine**

Another exception to the exclusionary rule is the inevitable discovery doctrine. Under the inevitable discovery doctrine, "illegally obtained evidence may be admitted if it ultimately or inevitably would have been discovered by lawful means." *United States v. Christy,* 739 F.3d 534, 540 (10th Cir. 2014) (internal quotation marks and citation omitted); *see also United States v. Cunningham,* 413 F.3d 1199, 1203 (10th Cir. 2005) (the inevitable discovery doctrine provides an exception to the exclusionary rule "and permits evidence to be admitted if an independent, lawful police investigation would have discovered it"). "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." *Cunningham,* 413 F.3d at 1203. "[A]s long as it can be shown by demonstrated historical facts that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible." *United States v. Griffin, 48 F.3d* 1147, 1151 (10th Cir. 1995).

The United States contends that even if the Court were to determine that the warrant was invalid, officers would have inevitably discovered the evidence by lawful means. (Doc. 42 at 22-24). The United States' principal argument is that if anyone along the chain of affidavit review had raised concerns about sufficiency of the evidence to support probable cause, Detective Marrujo had access to three pieces of additional evidence supporting probable cause for the search that he could have immediately provided for approval prior to executing the warrant. (*Id.*; Doc. 54 at 3). First, officers conducting surveillance of 1314 Apodaca Street observed Defendant enter and exit

the Apodaca Street residence at least once. Second, Rubi Perez observed Defendant inside the Apodaca Street residence on May 31, 2018 with a red and black backpack. Third, Jorge Lopez-Sandoval observed Defendant carry into the Apodaca Street residence on May 31, 2018, a large bag that Defendant had told him contained a rifle. The United States asserts that the officers' observations alone, if they had been included in the affidavit, would have been enough additional information to support probable cause in the affidavit. (Doc. 42 at 23).

Defendant rejects application of the inevitable discovery doctrine to this case, first arguing under *United States v. Knox*, 883 F.3d 1262 (10th Cir. 2018), that the Court cannot consider any information beyond the four corners of the warrant affidavit in making an inevitable discovery determination. Defendant further maintains that the additional evidence the United States is attempting to rely on was obtained through unconstitutional means and therefore cannot be used to support probable cause. (Doc. 53 at 7-16). Specifically, Defendant avers that Rubi Perez's statements were obtained following an unconstitutional protective sweep of the residence at 1314 Apodaca Street S.W., and that Jorge Lopez-Sandoval's statements were the product of an unlawful warrantless arrest on the property's curtilage. (*Id.*).

As an initial matter, the Court notes that Defendant's reliance on *Knox* is misplaced. In the context of analyzing applicability of the good faith exception, the *Knox* court held "that a suppression court's assessment of an officer's good faith is confined to reviewing the four corners of the sworn affidavit and any other pertinent information actually shared with the issuing judge under oath prior to the issuance of the warrant, as well as information relating to the warrant application process." 883 F.3d at 1272. Restriction of the inquiry to the four corners limitation found in *Knox* would obliterate the inevitable discovery doctrine, which requires the Court to consider information obtained by lawful means of discovery independent of the constitutional

violation. *See United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997). The additional probable cause information the United States relies on was not obtained through the unlawful search of the home, but rather through independent means. This does not, however, end the Court's inquiry.

The parties could not identify, nor could the Court find, Tenth Circuit precedent addressing application of the inevitable discovery doctrine to circumstances similar to those in this case. However, the United States cites to a recent decision from the District of New Mexico that is factually comparable to this case and that addresses similar legal issues. In *United States v. Streett,* the defendant similarly sought to suppress evidence seized from the search of a home at 4620 Plume Road N.W. by arguing that the warrant affidavit lacked the minimal nexus between the residence and the defendant, much less an indication that contraband related to the defendant's alleged criminal activity could be found there. Case No. 14-cr-3609-JB, 2018 WL 6182439, *25 (D. N.M. Nov. 27, 2018). The government maintained, as it does here, that the warrant was supported by probable cause, but that if the court concluded otherwise the inevitable discovery doctrine would prevent suppression. *Id.* at 29-30. To support this argument, the government asserted that the affiant was aware of facts not contained in the affidavit that would have demonstrated that the defendant lived at the location to be searched and were therefore sufficient to establish probable cause. *Id.* at *30. The government argued that the affiant's knowledge "shows the inevitability of him rectifying any deficiency identified by the judge." *Id.* The court agreed with the defendant that the affidavit failed to establish probable cause because it lacked the required nexus between the residence and the property that the officer had probable cause to believe contained evidence of child exploitation. *Id.* at *72.

The court nonetheless concluded that law enforcement officers would have inevitably obtained a valid warrant for a legal search of the property. *Id.* at *76. In reaching this determination the court applied the four-part test that the Tenth Circuit established in *United States v. Souza*:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search, 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained albeit after the illegal entry; and 4) evidence that law enforcement agents jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

*Id.* at *77 (quoting *United States v. Souza*, 223 F.3d 1197, 1203-04 (10th Cir. 2000)). As to the first factor, the court determined that the officer could not have done anything else to complete the warrant process because he obtained a search warrant - albeit an invalid one. *Id.* at *77. Turning to the second factor, the court found that the officer possessed a strong showing of probable cause when he searched the residence at 4620 Plume Road. *Id.* The officer had confirmed that the defendant's telephone number texted a minor asking for a nude photograph, had developed a firsthand account from the minor that her age was apparent from her Twitter profile, had received a report from a tip that was submitted to the National Center for Missing and Exploited Children, and had gotten the cell phone records obtained from the first warrant and defendant's driver's license which all stated that 4620 Plume was the defendant's residence. *Id.* The court considered the additional evidence connecting the defendant to the residence, even though the affiant failed to include these facts in the affidavit, because the affiant had this information when he requested the warrant. As to factors three and four, the court noted that there was a warrant, albeit invalid, and no evidence that the officer "jumped the gun" because of lack of confidence in probable cause. *Id.* at *77. The court concluded that "had the improper Second Warrant not issued and had [the officer] not searched the 4620 Plume residence under its auspices, [the officer] would have obtained a proper warrant, and the evidence in question would have been found." *Id.*

The Court will similarly apply the *Souza* factors to the facts of this case. Regarding the first factor, like the affiant in *Streett,* here Detective Marrujo could not have done anything further to complete the warrant process because he actually obtained a search warrant and even later sought an amended search warrant. Here too, the third and fourth *Souza* factors are satisfied because there was a warrant, although invalid, and there is no evidence in the record that Detective Marrujo or the other detectives "jumped the gun" because they lacked confidence in probable cause to search. Nevertheless, Defendant's request to suppress the evidence seized from 1314 Apodaca Street turns on the second *Souza* factor pertaining to the strength of the showing of probable cause at the time of the search. The Court disagrees with the United States that the additional fact that a detective had observed Defendant enter and exit the Apodaca house prior to his arrest would by itself be enough to carry the warrant affidavit over the probable cause hurdle. Rather, either the statements made by Rubi Perez and/or Jorge Lopez Sandoval, or some other additional evidence would be required. The defendant in *Streett* never challenged the means by which officers obtained the additional nexus evidence that the government then relied on to assert the inevitable discovery

doctrine. But here, Defendant alleges that Ms. Perez's and Mr. Lopez Sandoval's statements were, respectively, the result of an unconstitutional protective search and an unconstitutional detention.[5]

A defendant lacks standing to assert alleged constitutional violations on behalf of a third party. *See United States v. DeLuca,* 269 F.3d 1128, 1131 (10th Cir. 2001) ("Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises."); *see also Alderman v. United States,* 394 U.S. 165, 174 (1969) ("We adhere…to the general rule that Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted.").

However, in *United States v. Gonzales*, the Tenth Circuit allowed a defendant to challenge the voluntariness of a third-party's statement to police because that statement potentially implicated the defendant's Fifth Amendment due process rights. 164 F.3d 1285 (10th Cir. 1999); *see also United States v. Cade,* Case No. 18-cr-10026-02, 2019 WL 266233 (D. Kan. Jan. 18, 2019) (same). Similarly, in a Section 1983 claim for malicious prosecution, the Tenth Circuit

---

[5] The United States assumes, without further explanation, that the collective knowledge doctrine applies here such that the three additional probable cause facts "were available to Detective Marrujo at the time the search warrant was presented and could have been included in the affidavit." (Doc. 54 at 4). In his Response to the United States' Supplemental Memorandum (Doc. 57), Defendant cites to a case in which the collective knowledge doctrine is addressed, but does so in the context of his argument that the Court should not reopen the suppression hearing for additional evidence, instead of as a direct challenge to application of the doctrine here. There is a presumption of communication under the horizontal collective knowledge theory. In this case, there is evidence in the record that while Detective Marrujo was back at the station drafting the affidavit, he was also monitoring communications between the detectives on scene at 1314 Apodaca Street and heard detectives state that Defendant was on the property and that he and other people were in and out of the house on at least one occasion. Detective Zamora testified that he communicated information that he learned from the two interviews to another detective on scene, and Detective Marrujo testified that he came to learn of this information and that had the issuing judge determined there was an insufficient showing of probable cause, he could have readily provided this information to the judge prior to executing the warrant. The Court could not find any Tenth Circuit cases applying the collective knowledge doctrine to an inevitable discovery analysis. *But see United States v. Christy,* 810 F. Supp. 2d 1219, 1263 (D. N.M. 2011) (determining that the collective knowledge doctrine can be used to impute knowledge of exigent circumstances" and as such, because the court needed to "address whether exigent circumstances existed in its inevitable-discovery analysis, the Court [applied] the collective-knowledge doctrine"). Nevertheless, it is clear to the Court from Detective Marrujo's credible testimony that he could have readily provided the additional facts to the judge prior to executing the warrant had he been aware that the probable cause showing as insufficient.

addressed the defendant's challenges to the voluntariness of two witness statements that officers used to establish probable cause for his arrest. *Wilkins v. DeReyes,* 528 F.3d 790 (10th Cir. 2008); *see also, Hurt v. Wise,* 880 F.3d 831, 842 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) (noting that the defendants argued plaintiffs did not have standing to challenge the reliability of a third-party's confession, but stating that neither plaintiff "is asserting a constitutional right on [the third-party's] behalf when each argues that [the third-party's] interrogation did not give the police reliable evidence that she was involved" in the death. Rather, "[e]ach makes the assertion that the police used flimsy information to arrest *her*"). The Court finds that, under the circumstances in this case, Defendant has standing to challenge the voluntariness of the statements the United States is relying on to establish the strength of the probable cause at the time the search was executed.

The Court looks at the totality of the circumstances when assessing whether a witness's statements are voluntary. *United States v. Dowell,* 430 F.3d 1100, 1107 (10th Cir. 2005). Factors to consider include "the [witness's] age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental characteristics, the location of interrogation, and the conduct of the police officers." *Id.* Ultimately, "[a] statement is involuntary if the government's conduct cause[d] the [witness'] will to be overborne and his capacity for self-determination critically impaired." *Gonzales,* 164 F.3d at 1289 (internal quotation marks and citation omitted) (alterations in original). Defendant has the burden to prove that Ms. Perez's and Mr. Lopez Sandoval's statements were in fact involuntary. *Gonzalez,* 164 F.3d at 1289.

At the time that Detective Zamora arrived at 1314 Apodaca Street around 6:00 p.m. to conduct interviews of Ms. Perez and Mr. Lopez Sandoval, Ms. Perez and her children had been

standing outside of the house at 1314 Apodaca Street for at least an hour following a protective sweep of the residence. Officers would not allow them to reenter the house and would not let Ms. Perez leave the property. Ms. Perez noted that officers pointed their guns as they opened the door to the house and ordered the occupants to step outside. However, once the house was cleared, officers put their guns down and did not have their guns raised when speaking with her. Ms. Perez confirmed that officers were respectful when talking to her. At no point was Ms. Perez placed in handcuffs or told that she was under arrest. Detective Zamora spoke with Ms. Perez outside on the property. He advised her of her *Miranda* rights and Ms. Perez agreed to speak with the detective. At no point did Detective Zamora threaten Ms. Perez or any member of her family. In fact, nothing in the transcript of the conversation between Detective Zamora and Rubi Perez suggests inappropriate behavior or improper interrogation tactics on the part of the detective, or a reluctance to respond to questions by Ms. Perez. The interview itself lasted less than nine minutes, and after the interview Ms. Perez was allowed to leave the premises. Moreover, nothing about Ms. Perez's age, intelligence, or education suggests that she would be susceptible to police coercion. Ms. Perez testified at the suppression hearing and the Court found her testimony competent and credible. The circumstances here do not reflect that Ms. Perez's will was overborne and her capacity for self-determination critically impaired. The Court finds that Ms. Perez's statements to Detective Zamora were voluntary.

The Court next turns to Detective Zamora's interview with Mr. Lopez Sandoval. When officers approached the white Nissan with Mr. Lopez Sandoval in the driver's seat, they had their guns raised and Mr. Lopez Sandoval was immediately placed in handcuffs. Mr. Lopez Sandoval testified that he had been in handcuffs for several hours by the time Detective Zamora arrived at approximately 6:16 p.m. to interview him. Mr. Lopez Sandoval testified that the officers were

respectful with him but stated that he was "afraid" and "really nervous" because he "had never been through anything like this." Detective Zamora brought Mr. Lopez Sandoval to one of the police vehicles on site to conduct the interview. Prior to questioning, Detective Zamora advised Mr. Lopez Sandoval of his *Miranda* rights, and Mr. Lopez Sandoval agreed to speak with the detective. As with Ms. Perez, there is nothing in the transcript of the conversation between Mr. Lopez Sandoval and Detective Zamora that suggests the detective used improper or coercive interrogation tactics. Nor is there an indication in the record, including Mr. Lopez Sandoval's testimony at the hearing, that Mr. Lopez Sandoval's age, education, or intelligence would make him susceptible to coercive police conduct or somehow rendered his *Miranda* waiver or statements involuntary. It appears that the interview with Mr. Lopez Sandoval lasted no longer than twenty-three minutes.[6] Following the interview with Mr. Lopez Sandoval, detectives removed his handcuffs and allowed him to return to his family.

The defendant has the burden of demonstrating that a witness's statement was involuntary when a defendant essentially seeks to suppress the witness's statement to protect the defendant's own rights. In this case, although the circumstances here certainly give pause, there is little indication that officers coerced Mr. Lopez Sandoval into waiving his *Miranda* rights and involuntarily providing statements to the detective.

With the addition of information Detective Marrujo had that an officer surveilling the scene at 1314 Apodaca Street S.W. had observed Defendant enter and exit the house, along with the two witness statements, Detective Marrujo possessed a sufficient showing of probable cause at the time the search occurred and the second *Souza* factor is satisfied. In addition to the two witness

---

[6] The transcript does not indicate the length of the interview. However, Detective Zamora testified that he began the interview with Mr. Lopez-Sandoval at approximately 6:16 p.m. His interview with Ms. Perez began at approximately 6:39 p.m. As a result, the interview with Mr. Lopez-Sandoval could not have lasted longer than twenty-three minutes.

statements, the officer's observation, the facts in the affidavit that the red Camaro in which Defendant fled was parked at 1314 Apodaca Street and that Defendant was apprehended there, the record also reflects that Detective Marrujo had information that the 1314 Apodaca Street S.W. address was associated with Karen Perez-Morales' license and that she had told officers that Omil Cotto-Gomez was her husband – information in Detective Marrujo's possession that also supports probable cause. The Court concludes, similarly to the court in *Streett*, that had the improper warrant not issued and had detectives not searched the 1314 Apodaca Street residence under its authority, Detective Marrujo would have inevitably obtained a valid warrant and the 1314 Apodaca Street residence would have been searched legally. Accordingly, the Court will not suppress any of the physical evidence seized during the search of the Apodaca Street residence on May 31, 2018.

### E. The Search Warrant Was Not Overbroad

Defendant's final argument is that the warrant was overbroad. Under the Fourth Amendment, a warrant must "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrant is sufficiently specific if it "enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Robertson*, 21 F.3d 1030, 1033 (10th Cir. 1994). Broad and generic terms may be sufficient if "the description is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Leary,* 846 F.2d 592, 600 (10th Cir. 1988) (quotation omitted). Nevertheless, "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow." *United States v. Riccardi,* 405 F.3d 852, 862 (10th Cir. 2005).

Defendant avows that the warrant here is constitutionally overbroad because it requested seizure of *all* cellphones[7] and "any and all firearms evidence to include pistols, revolvers, rifles, shotguns, etc. as well as any spent casings, live ammunition, holsters, etc.," from a home that the warrant fails to connect to Defendant. Defendant argues the warrant was based on information that specifically a handgun, and not other weapons, was used in the alleged road rage incident. (Doc. 47). Defendant cites to *United States v. Jimenez,* 205 Fed. App'x 656, 661-62 (10th Cir. 2006) to support his argument. In *Jimenez* the defendant claimed, as Defendant does here, that the warrant's authorization to search for "any firearms" was constitutionally overbroad because officers were investigating a crime involving a handgun specifically. *Jimenez,* 205 F. App'x at 661. At the suppression hearing, the officer testified that at least one witness stated that the shooter had a handgun. *Id.* The officer further testified that he suspected the defendant, a convicted felon, was the shooter which would render possession of "any firearm" evidence of commission of a crime. *Id.* The Tenth Circuit agreed the warrant was overbroad, holding that there was probable cause to search for the handgun but not for "any firearms" because the affidavit underlying the search warrant failed to mention that there was reason to suspect the defendant was a convicted felon. *Id.* at 662.

The affidavit here states that a male subject "fire[d] multiple shots at the SUV" without specifying the type of firearm detectives recognized from the surveillance footage. However, unlike the affidavit in *Jimenez,* Detective Marrujo included in the search warrant affidavit for 1314 Apodaca Street that deputies researched the person they believed to be the shooter, Omil Cotto-Gomez, and found that he had been convicted of at least one felony in the past ten years. Because the affidavit included information that Defendant was a felon, the request to search for and seize

---

[7] Officers did not seize any cellphones in this case so the Court will not address whether the request for cellphones was overbroad.

"any and all firearm evidence" was not overbroad. *See also United States v. Campbell,* 256 F.3d 381, 389 (6th Cir. 2001) (police investigating the theft of specific firearms obtained a warrant to search for "all firearms," but the court deemed that the warrant was not overbroad because the affidavit revealed that the suspect was a felon); *United States v. Smith,* 62 Fed. App'x 419, 422 (3d Cir. 2003) (same).

## CONCLUSION

Because the search warrant affidavit provided a sufficient nexus between evidence of the alleged road rage incident, the Defendant, and 1314 Apodaca Street, it established probable cause. In the alternative, the good faith exception applies because the supporting affidavit contained some facts establishing a minimally sufficient nexus such that Detective Marrujo acted with an objective good-faith belief that the warrant was properly issued by a neutral judge. Moreover, because detectives inevitably would have discovered the evidence seized from 1314 Apodaca Street independent of any invalid warrant, the inevitable discovery doctrine applies. Finally, the Court concludes that the warrant was not overbroad.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress Evidence Derived as a Result of an Invalid Search Warrant for 1314 Apodaca Street S.W., Albuquerque, New Mexico and Memorandum in Support Thereof (Doc. 39) is DENIED.


_____
SENIOR UNITED STATES DISTRICT JUDGE